**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36454**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2010 Opinion No. 59** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: August 27, 2010** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| VERNA L. LOMBARD, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Clearwater County. Hon. John H. Bradbury, District Judge.

Judgment of conviction and sentence, <u>affirmed</u>. Order for restitution, <u>affirmed</u>.

Clark and Feeney, Lewiston, for appellant. John C. Mitchell argued.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent. Mark W. Olson argued.

---

PERRY, Judge Pro Tem

This is an appeal from the sentence and restitution order imposed upon Verna L. Lombard's conviction for burglary and grand theft. Lombard contends that the district court abused its discretion by ordering a restitution amount that was unsupported by substantial evidence. Lombard further contends that in sentencing her, the district court erred by considering facts unsupported by substantial evidence in the record. We affirm.

**I.**

**FACTS AND PROCEDURAL BACKGROUND**

Lombard was employed as a clerk with Mary Ann's Groceries in Weippe since at least June 1, 2004. In August 2007, in response to a customer's tip, Don Ebert, co-owner of Mary Ann's Groceries, set up hidden video cameras in his store to observe the activities of Lombard.

During the six days Lombard was under video surveillance, Ebert discovered that on approximately fifty-three occasions Lombard entered the "no sale" key into the cash register, but still took money from customers in exchange for groceries or gas and placed it in the cash

1

register. This enabled Lombard to execute cash sales that would not be recorded as sales on the cash register till tapes. Periodically during her shift, Lombard would take money from the cash register and put it in her back pocket. At the end of the day, the sales receipts and money in the till would correspond.

Ebert also located a number of credit card receipts that indicated completed sales processed by Lombard, which corresponded by date and time with "no sale" events entered into the cash register during Lombard's shifts. The earliest receipt, for $49.95, was from October 19, 2004.

Additionally, Ebert took a random sampling and reviewed the cash register till tapes of six random months which spanned Lombard's employment. He noticed that the amount of "no sale" events entered during Lombard's shifts were always significantly higher than the amount of "no sale" events entered during other employee's shifts. The difference in the amount of "no sale" events recorded during Lombard's shift, compared to the amount of "no sale" events recorded during other employee's shifts or "excessive no sale events," increased throughout Lombard's employment, from an average of 7.46 per day in July 2004, to an average of 12.26 per day in June 2007. Over the course of her employment, Lombard's shift averaged 10.13 "excessive no sale events."[1]

On September 9, 2007, after Lombard completed her sixth shift documented by video surveillance, she was arrested for burglary and theft. At the time of her arrest, Lombard had $282 in her back pocket. The bills were separated into ten groups that were folded together. The arresting officer intentionally misled Lombard into believing that she had been under video surveillance since late June 2007. Lombard then admitted stealing a total of $400 from Mary Ann's Groceries beginning in late June 2007, stating she stole approximately $50-60 dollars per day, but that she did not steal everyday.

The state charged Lombard with one count of burglary and one count of grand theft resulting from her alleged conduct while employed with Mary Ann's Groceries. A jury found Lombard guilty of burglary and grand theft. The district court sentenced her to concurrent

---

[1] Ebert testified there are legitimate reasons to hit the "no sale" key which include making change for a customer, cashing a check or money order, or taking out bills from the till and then going to the office to get coins to replace the bills.

unified sentences of eight years, with two and a half years determinate, and retained jurisdiction.[2] The court designed the indeterminate portion of the sentence, at least in part, to allow Lombard ample time to comply with any restitution order if she were to be subsequently placed on probation or parole.

At the restitution hearing, the state submitted an affidavit for restitution requesting that Lombard be ordered to pay $100,000 to Mary Ann's Groceries, and $5,000 to Western Community Insurance Company, which had paid on a policy owned by Ebert and his wife. Attached to the affidavit was a letter from the Eberts stating they believed Lombard stole over $100,000. To support this conclusion, Ebert, who has a background in statistics, submitted several alternative estimates of the actual loss. Ebert multiplied either the low, medium or high average number of "excessive no sale" events by the average amount taken per "no sale" event, and again multiplied by the number of shifts Lombard had worked since her first documented theft, or alternatively her first day of work, which resulted in a range from $71,936.81 to $204,446.86 in loss. Lombard objected many times to the estimates, arguing they were based on a statistical model, not on substantial evidence.

The state presented additional evidence both at trial and at the sentencing hearing concerning the extent of Lombard's thefts. At trial, the witness who tipped off the Eberts testified that from June to August 2007, he observed Lombard complete 20-30 suspicious transactions, where the register tape did not move like it did when other employees worked the register. At trial, Ebert testified the gross sales went up immediately after Lombard was fired. Later at sentencing, he stated gross sales went up approximately $150,000 the year after Lombard was fired, although he admitted factors such as the price of gas, the economy and the weather also could have impacted the amount of gain. At trial, Ebert further testified that the amount of "no sale" events occurring during Lombard's shifts "spiked" during a two-week period when the Eberts were away on vacation and had left the store under limited supervision. Lombard did not present any evidence or make a recommendation of what the restitution amount should be.

---

[2] There is no clear information on the record about the result of Lombard's rider. However, Lombard's brief states, "The consideration of these models as a restitution amount influenced the District Court's decision on how long Verna Lombard's sentence would be with the District Court's intent that Verna be on probation **for up to eight years** in order to pay the restitution."

The district court sentenced Lombard to a unified term of eight years with two and a half years determinate for both the burglary and grand theft charge, to run concurrently. To determine the restitution amount, the district court averaged the two lowest range estimates provided by Ebert and ordered Lombard to pay $80,000 in restitution to Mary Ann's Groceries, and $5,000 to Western Community Insurance Company. Lombard timely appealed her sentence and the restitution order.

## II.

## DISCUSSION

Lombard claims both her sentence and restitution amount were an abuse of discretion by the district court. She states her sentence was erroneously based on a restitution amount that is not supported by substantial evidence, but is only based on a statistical model. For this reason, the restitution award will be considered first, followed by the sentence.

**A.      Whether the District Court's Restitution Award Was Supported by Substantial Evidence**

Lombard asserts that because a victim is only allowed restitution damages for economic loss actually suffered, the district court erred in ordering an award based on a statistical model, which she contends did not constitute substantial evidence.

The decision whether to order restitution and in what amount is within the discretion of a district court, guided by consideration of the factors set forth in I.C. §19-5304(7) and by the policy favoring full compensation to crime victims who suffer economic loss. *State v. Richmond*, 137 Idaho 35, 37, 43 P.3d 794, 796 (Ct. App. 2002); *State v. Russell*, 126 Idaho 38, 39, 878 P.2d 212, 213 (Ct. App. 1994). The trial court is directed by statute to base the amount of economic loss to be awarded upon the preponderance of evidence submitted to the trial court by the prosecutor, defendant, victim, or presentence investigator. I.C. § 19-5304(6). The determination of the amount of restitution is a question of fact for the trial court whose findings will not be disturbed if supported by substantial evidence. *State v. Hamilton*, 129 Idaho 938, 943, 935 P.2d 201, 206 (Ct. App. 1997). We will not overturn an order of restitution unless an abuse of discretion is shown. *Richmond*, 137 Idaho at 37, 43 P.3d at 796.

In determining the amount of restitution for a crime victim, the trial court, "shall consider the amount of economic loss sustained by the victim as a result of the offense, the financial resources, needs and earning ability of the defendant, and such other factors as the court deems appropriate." I.C. § 19-5304(7). Restitution may only be awarded for actual economic loss

4

suffered by the victim. I.C. § 19-5304(1)(a)(2). The economic loss need only be established by a preponderance of the evidence, *see* I.C. § 19-5304(6), and can be established by the owner of the stolen property. *See Empire Lumber Co. v. Thermal-Dynamic Towers, Inc.*, 132 Idaho 295, 306, 971 P.2d 1119, 1130 (1998).

In embezzlement cases such as this, where employee theft has spanned a long period of time, there are inherent challenges involving the estimation of the actual stolen amount.[3] *See State v. Benoit*, 51 P.3d 495, 500-01 (Mont. 2002). The Idaho appellate courts have not yet ruled on how best to meet this challenge. The Montana Supreme Court has held that the losses sustained from [defendant's] admitted acts of theft are recoverable, even though the actual losses may be uncertain, if the losses were calculated by use of reasonable methods based on the best evidence available under the circumstances. *Id.* at 500.

In *Benoit*, the employee's theft could not be determined with certainty, so the manager of Burger Master estimated the amount by calculating the total number of voided transactions initialed by Benoit during her employment. *Id.* at 497. She then assumed 25 percent of Benoit's voided transactions were legitimate, subtracted 25 percent from the total monetary voids by Benoit, and arrived at $1,833.84. Next, the manager estimated the amount Benoit had stolen through fake "gold card" (coupons that customers bought directly from cashiers to get an immediate discount on their purchase) sales by subtracting the average total number of "gold card" sales by all employees, from the total number sold by Benoit. Then the manager estimated the average monetary amount of each falsified "gold card" sale by averaging the value of the five different possible "gold card" values, and came up with $3.02 per transaction. She multiplied the average monetary amount of each "gold card" sale by the number of estimated sales falsified by Benoit, which totaled $12,466.00. Although these figures were not exact, and it was possible Benoit stole more or less than the restitution amount, the Montana court held that Burger Master's manager used reasonable methods based on the best evidence available under the circumstances, and her calculations were properly used to determine the restitution amount. *Id.* at 500.

---

[3]    The district court judge in this case stated, "If we took your approach that you can never use a statistical model there would never be restitution in this sort of an offense, and what that would mean is that the criminal conduct trumps the victim's rights for restitution. And I don't think that is what the law requires."

Like the theft in *Benoit*, the exact amount of Lombard's theft cannot be determined with absolute certainty. However, we conclude that this challenge does not prohibit the recovery of restitution by the victim. Here, the best evidence available included the video surveillance of Lombard engaging in fifty-three suspicious "no sale" events over six days, which then corresponded with multiple events of Lombard reaching into the till, taking money out and putting it in her back pocket; the $282, including a one hundred dollar bill, found in Lombard's back pocket at the time of her arrest, folded into ten separate groups; the first documented theft from a credit card transaction on October 19, 2004; and the "excessive no sale" events that averaged 10.13 per shift, over a three-year period. Similar to the manager of Burger Masters in *Benoit*, Ebert used the best evidence available to him under the circumstances to determine the probable stolen amount.

Because the specific methods utilized by Ebert in calculating Mary Ann's Groceries' pecuniary losses are necessary for our analysis, we will examine those methods in detail. Ebert used a three-number formula to determine the restitution amount. Ebert's formula is: the number of "excessive no sale" events multiplied by the average amount taken per "no sale" event multiplied by the number of shifts Lombard had worked since the first documented theft, or alternatively, her first day of work.

To determine the amount of "excessive no sale" events, Ebert randomly sampled six months of cash register tape. He averaged the number of "no sale" entries recorded by the cash register till during Lombard's shifts compared to the "no sale" entries recorded during the shifts of other employees.[4] This sampling gave him an upper limit (11.67), lower limit (8.60), and an average (10.13) of "excessive no sale" events per shift. To determine the amount taken per "no sale" event, Ebert divided $260 (although Lombard was found with $282 when arrested, Ebert mistakenly used $260 in his calculation)[5] by 10.13, (the average number of daily "excessive no

---

[4]   Ebert testified he compared "shift to shift," in other words he compared the shifts Lombard worked, with shifts she did not work, that occurred at the same time. For example, if Lombard's shift was noon to seven, Ebert only compared her shift with other shifts that occurred from noon to seven.

[5]   This is an error which makes the estimates lower, and potentially better for Lombard. The district court never commented on this error.

sale" events), which equals $26 per "no sale" event. Alternatively, Ebert used $160 ($260 minus the one-hundred dollar bill Lombard said she brought from home) divided by 10.13 which equals $16 per "no sale" event. The third number is the number of shifts Lombard worked since the first documentation of theft on October 19, 2004,[6] through August 2007, which is 523, or alternatively, the number of shifts Lombard worked from the start of her employment[7] in July 2004, which is 674.

Using these numbers Ebert came up with a broad scope of possible restitution amounts: a low of $71, 936.81 [8.60 ("no sale" events) x $16 (amount per "no sale" event) x 523 (shifts worked)] to a high of $204,446.86 [11.67 ("no sale" events) x $26 (amount per "no sale" event) x 674 (shifts worked)]. Although the amount of loss was based on a statistical model, this model itself was based on evidence on the record.

On appeal, Lombard has not provided any argument or authority from any jurisdiction holding that a trial court erred by considering calculations such as those used in this case. A determination of an appropriate restitution amount is left to the sound discretion of the district court. We defer to the weight given by the district court to such evidence.

Finally, the state presented other evidence supporting the request for restitution, in addition to the evidence used in the statistical model. Ebert testified after Lombard was fired, the gross sales went up immediately and were approximately $150,000 higher the next year. He identified factors such as the price of gas, the economy and the weather that also could have impacted the amount of their gain. At trial, the witness who tipped off the Eberts testified that from June to August 2007, he observed Lombard complete twenty to thirty suspicious transactions, where the register tape did not move like it did when other employees worked the register. Ebert also testified that the amount of "no sale" events occurring during Lombard's

---

[6] There is conflicting testimony about when the first documented theft occurred. At the sentencing hearing Ebert states it was in July of 2004, but every other time he says it was October 19, 2004.

[7] Lombard's start date is not stated in the record. Ebert only states, "I believe it was 2003 or four"; "It's on the record that I submitted. I believe it was maybe '03." In the statistical model the state submits, it appears Ebert used July 1, 2004, as Lombard's start date.

shifts "spiked" during a two-week period when the Eberts were away on vacation, and had left the store under limited supervision.

Considering all the evidence in the record, including the evidence used in the statistical model presented by Ebert, we conclude there was substantial evidence from which the district court could find that Mary Ann's Groceries suffered a loss of $85,000. Therefore, the district court did not an abuse its discretion in awarding this amount in restitution.

**B.      Whether the District Court Abused Its Discretion in Sentencing Verna Lombard**

Lombard argues the district court abused its discretion because it considered facts not supported by substantial evidence, specifically the statistical model presented by Ebert, to arrive at the restitution amount, and then it relied on the unsupported restitution amount to determine the length of Lombard's sentence. Lombard claims if the restitution amount is found to be unsupported by substantial evidence and modified, then the sentence must be modified as well. As discussed above, we have concluded that the restitution amount was supported by substantial evidence in the record. Therefore, the district court's consideration of the restitution amount in sentencing Lombard was not an abuse of discretion.[8]

### III.
### CONCLUSION

The district court did not err in awarding the restitution amount because it was based on substantial evidence and therefore was not an abuse of discretion. Lombard has failed to show her sentence was unreasonable. Therefore, we conclude the district court did not abuse its discretion at sentencing. Lombard's judgment of conviction and sentence, and order for $85,000 in restitution are affirmed.

Chief Judge LANSING and Judge MELANSON, CONCUR.

---

[8]      Lombard appears to argue the district court abused its discretion by rejecting the parties' Rule 11 plea agreement. However, this claim is not included in Lombard's statement of issues and is not supported by argument or authority. Therefore we will not address it further. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996); I.A.R. 35(a)(4).